John Heiderscheidt
Heiderscheidt Law Group, LLC                                                   **DETAINED**
7257 W. Touhy, Suite 201-A
Chicago, IL 60631
EOIR # RR660054

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## JENA, LA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **PEREZ CANOLA, IVAN GILBERTH** | ) | A# 244-071-517 |
| | ) | |
| In Removal Proceedings | ) | |

Immigration Judge: May, Jennifer A. Next Hearing: September 4, 2025 at 8:30 AM.

## RESPONDENT'S REPLY IN OPPOSITION TO DHS'S MOTION TO PRETERMIT

DETAINED

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**JENA, LA**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **PEREZ CANOLA, IVAN GILBERTH** | ) | A# 244-071-517 |
| | ) | |
| In Removal Proceedings | ) | |

**RESPONDENT'S REPLY IN OPPOSITION TO DHS'S MOTION TO PRETERMIT**

**I. INTRODUCTION**

DHS seeks to pretermit Respondent's applications for asylum, withholding of removal, and CAT protection under the U.S.–Honduras Asylum Cooperative Agreement ("ACA"), asserting that because he is not Honduran and entered after November 19, 2019, he must seek protection in Honduras. Respondent is a native and citizen of Ecuador who has never lived in or traveled through Honduras and has no family, friends, or support network there. If removed to Honduras, he would enter as a visibly foreign South American migrant in one of the region's most dangerous environments for third-country nationals. DHS offers no evidence that the ACA with Honduras is currently operational in 2025, that Honduras is accepting transferees under its terms, or that it can ensure safe and fair processing. The rule published at 90 Fed. Reg. 30076 does not establish present implementation, and DHS ignores the exception in 8 C.F.R. § 1240.11(h)(3).

**II. LEGAL STANDARD**

Pretermission is an extraordinary procedural measure appropriate only when an application is legally insufficient on its face. *See Matter of Fefe*, 20 I&N Dec. 116, 118 (BIA 1989). Where factual disputes exist, the Immigration Judge must hold an evidentiary hearing to resolve them.

*See Cinapian v. Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009). DHS bears the burden of proving ACA applicability by a preponderance of the evidence. 8 C.F.R. § 1240.11(h)(1). The Immigration Judge must also determine whether an exception applies under § 1240.11(h)(3), including whether it is more likely than not the applicant would be persecuted or tortured in the designated ACA country. Without satisfying these requirements with competent, credible, and current evidence, pretermission is legally impermissible.

## III. ARGUMENT

### A. DHS Has Not Met Its Burden to Prove ACA Applicability

Under 8 C.F.R. § 1240.11(h)(1), DHS bears the burden of proving ACA applicability by a preponderance of the evidence. This requires competent, reliable proof that all statutory and regulatory requirements are met and that Honduras is presently prepared to receive Respondent in compliance with U.S. treaty obligations. DHS offers no evidence that, in 2025, Honduras is accepting ACA transferees, that transfer mechanisms are functioning, or that a safe and orderly reception process exists. Without such proof, ACA application is not legally or practically viable, and pretermission would be premature. Reliance solely on the facts that Respondent is not a Honduran national and entered after November 19, 2019, does not establish that Honduras is a safe third country for him.

### B. Respondent Qualifies for the Exception Under 8 C.F.R. § 1240.11(h)(3) Because He Is More Likely Than Not to Be Persecuted or Tortured in Honduras

Even if the ACA were applicable, the exceptions bar pretermission. Under 8 C.F.R. § 1240.11(h)(3) and 90 Fed. Reg. 30078-80, the ACA does not apply if the respondent demonstrates that it is more likely than not he would be persecuted or tortured in the ACA country. Respondent clearly meets the exception in 8 C.F.R. § 1240.11(h)(3)(iii) because it is more likely than not that

he would be persecuted or tortured in Honduras. Respondent is a native and citizen of Ecuador who has never lived in or even passed through Honduras, has no family, friends, or community ties there, and no access to any form of support network. Reports from Human Rights Watch, Amnesty International, and Human Rights First show that non-Honduran migrants in Honduras face extreme violence, corruption, and impunity, with an under-resourced asylum system and high risk of refoulement. Pervasive gang control and Honduras's small size make internal relocation unsafe and unrealistic. *See* Exhibit 1 (Country Conditions of Honduras). Under these conditions, Respondent would likely be denied meaningful protection and returned to Ecuador in violation of U.S. obligations under the Refugee Convention and the Convention Against Torture.

C. Arrest Inside the Court Raises Grave Due Process Concerns

After appearing for his most recent master calendar hearing in full compliance with court orders, Respondent was arrested in the court by ICE officers, even though his case remains active and DHS's motion to dismiss was ultimately denied. This extraordinary action occurred immediately after the hearing and has severely impaired his ability to communicate with counsel, gather supporting evidence, and prepare his defense. Pretermitting his applications while he remains in custody would compound the prejudice caused by this arrest and raise serious Fifth Amendment due process concerns. Given that the Immigration Court retains jurisdiction over this matter, Respondent is entitled to have his applications decided after a full and fair hearing, rather than being denied without proper consideration.

D. Due Process Requires Evidentiary Hearing

Determining whether the ACA applies, whether Respondent qualifies for an exception, and whether Honduras can offer effective protection are fact-intensive questions. These issues cannot be resolved solely on DHS's assertions; they require live testimony, documentary evidence, and

cross-examination. The Fifth Amendment guarantees a full and fair hearing on such matters, as recognized in *Cinapian v. Holder*, 567 F.3d 1067, 1074 (9th Cir. 2009). Pretermission here would deny that right. The proper course is to set the case for a merits hearing, allowing both parties to present evidence and the Court to decide based on a complete, contested record.

## IV. CONCLUSION

DHS has not met its burden to establish ACA applicability or to rebut the exception under 8 C.F.R. § 1240.11(h)(3). Given Respondent's Ecuadorian nationality, lack of ties to Honduras, and the substantial evidence of danger and deficient protection there, these issues and Respondent's asylum application must be adjudicated at a merits hearing. The motion should be denied.

Respectfully Submitted,

*John W. Heiderscheidt*

Attorney for Respondent

John Heiderscheidt
Heiderscheidt Law Group, LLC
7257 W. Touhy
Suite 201-A
Chicago, IL 60631
312-331-0087
info@subscriptionlawyer.com
EOIR # RR660054

# Table of Contents

- Exhibit A: Country Conditions of Honduras                    pp. 7-69

DETAINED

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**JENA, LA**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| **PEREZ CANOLA, IVAN GILBERTH** | ) | A# 244-071-517 |
| | ) | |
| In Removal Proceedings | ) | |

**PROOF OF SERVICE**

I hereby certify that the forgoing "Respondent's Reply in Opposition to DHS's Motion to Pretermit" was served on OCC through ECAS on this day.

*John W. Heiderscheidt*
Attorney for Respondent

John Heiderscheidt
Heiderscheidt Law Group, LLC
7257 W. Touhy
Suite 201-A
Chicago, IL 60631
312-331-0087
info@subscriptionlawyer.com
EOIR # RR660054

EOIR — 8 of 70

# Exhibit A

FACT SHEET: MAY 2020

# Is Honduras Safe for Refugees and Asylum Seekers?

On May 1, 2020, the Trump administration published an agreement signed with Honduras in September 2019, that purports to allow the United States to transfer third-country asylum seekers to Honduras, despite the failure of Honduras to protect its own citizens, the dangers refugees face there, and the lack of effective systems to protect them from return to persecution. The U.N. Refugee Agency (UNHCR) and U.S. State Department have both described Honduras's asylum system as "nascent," and UNHCR has expressed "serious concerns" about the accord. This agreement and similar ones with El Salvador and Guatemala are designed to block refugees from asylum in the United States, instead sending them to some of the most dangerous countries in the world – from which people are fleeing in search of protection. These agreements violate U.S. refugee and immigration law as well as U.S. treaty commitments. Transfers to Guatemala began in November 2019 after an interim final rule was published that month implementing the asylum-seeker transfer accords.

Honduras falls far short of the U.S. law requirements that would permit U.S. officials to treat it as a "safe third country" for the purpose of turning back asylum seekers. Rather than sending refugees to a country that cannot or will not protect them, the United States should support stronger refugee protection across the region, uphold its own asylum legal obligations at home, and support effective human rights, anti-corruption and rule of law initiatives in Honduras. This factsheet explains the concept of "safe third country" agreements under U.S. law and why Honduras does not meet the legal requirements that would allow such transfers of asylum seekers.

## What is a "safe third country"?

The term "safe third country" generally refers to agreements that allow one country to turn away or send asylum seekers fleeing another country to a third "safe" country where they can instead receive refugee protection. To legally send a person seeking asylum in the United States or at a U.S. port of entry to a third country, U.S. law requires that three "safe third country" requirements must be met. Congress has spelled out the requirements that must be met before U.S. officials and agencies can send or remove asylum seekers to a third country, and the Secretary of Homeland Security and the Attorney General must certify that these requirements have been met before such an agreement can be implemented.

**Specifically**, **to be a safe third country, the** Immigration and Nationality Act **requires that the country must:**

☑ **Guarantee asylum seekers protection from persecution:** The country must be a place where the refugee's "life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion."

☑ **Provide access to "full and fair" procedures to assess asylum requests:** The country must afford "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

☑ **Agree to be designated a safe third country:** The country must have entered into a bilateral or multilateral agreement with the United States.

Canada and the United States signed a safe third agreement in December 2002, which went into effect in December 2004. Thus, asylum seekers who enter the United States after passing through Canada are returned and permitted to request asylum there unless they qualify for an exception to the agreement and vice versa.

# Honduras does not meet safe third country legal requirements.

## Refugees are not adequately protected in Honduras:

Many Hondurans are fleeing violence and seeking refuge in other countries because their government fails to protect them. According to the UNHCR, 24,000 Hondurans fled their country to seek asylum in the United States in 2018. More than 76,000 asylum applications by Hondurans are currently pending adjudication worldwide. There were an estimated 191,000 persons displaced within Honduras due to violence, national and transnational gang activity, and human trafficking, according to the U.S. State Department.

According to the Congressional Research Service, Honduras "remains one of the most violent countries in the world."  In 2019, the number of murders rose in Honduras making its homicide rate the highest in Central America. Despite restrictions imposed by the government due to COVID-19, the murder rate remains high in 2020. In 2019, two Nicaraguan refugees were among those murdered in Honduras; other Nicaraguan asylum seekers have reportedly been tracked by persecutors and killed in Honduras.

The U.S. State Department reports that migrants, including refugees, are vulnerable to attacks by criminal groups – groups the Honduran government is unable or unwilling to control, particularly given rampant corruption and the ties between government officials and criminal entities. In late April 2020, the U.S. Department of Justice indicted the former head of the Honduran National Police, accusing him of abusing his law enforcement position as part of a conspiracy involving high-ranking Honduran politicians – including the current Honduran president. According to Human Rights Watch, "impunity for crime and human rights abuses is the norm" in Honduras.

Asylum seekers in Honduras are at risk, not only due to their inherent vulnerabilities as refugees, but also on account of their race, nationality, gender, sexual orientation, gender identity. Women, children, and LGBT individuals, in particular, face high levels of violence in Honduras with many forced to flee to seek protection elsewhere. Indigenous people and communities of Afro-descent are also the targets of threats and violence in Honduras. Human trafficking is widespread in Honduras and often causes internal displacement. The U.S. State Department's 2019 Trafficking in Persons Report for Honduras found that "women, children, LGBTI Hondurans, migrants, and individuals with low education levels are particularly vulnerable to trafficking."

## Many refugees are left unprotected due to lack of full and fair procedures:

Refugees returned to Honduras would also be at grave risk of being sent back to their countries of persecution due to glaring deficiencies in the country's refugee protection system.

Honduras's tiny asylum system does not have the ability to assess, adjudicate and manage the cases of the many Brazilian, Guatemalan, Mexican, Nicaraguan, Salvadoran and other asylum seekers Honduras has reportedly agreed to accept. Over an eleven year period, from January 2008 to July 2019, only 299 requests for asylum were registered with the Honduran National Institute for Migration, and only 50 were recognized as refugees. Moreover, asylum seekers in Honduras can file requests for protection in only three locations, and the country does not issue work permits for asylum seekers, leaving refugees with no means to support themselves while they wait for an unequipped system to process their requests for protection.

In expressing its opposition to the accord, UNHCR has warned that the country's asylum system is only "nascent." The U.S. State Department has also described the country's asylum system as "nascent," explaining that its effectiveness "had not been fully proven."

# Honduras 2023 Human Rights Report

## Executive Summary

The human rights situation in Honduras was problematic, due to the prolonged *estado de excepción* (state of emergency) and an increase in gender-based violence. The Office of the UN High Commissioner for Human Rights raised concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción. Violence and extortion persisted at high levels, due to competition among gangs.

Significant human rights issues included credible reports of: arbitrary or unlawful killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including threats against media members by criminal elements; serious government corruption; extensive gender-based violence, including domestic violence, sexual violence, and femicide; and crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may

have committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major obstacles to obtaining convictions.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations.  The government investigated and prosecuted some of these crimes, but impunity was widespread.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed one arbitrary or unlawful killing within the National Penal Institute.  No further information was publicly available regarding the incident.

The Public Ministry reported eight killings of human rights activists as of September.  For example, unknown assailants shot and killed Aly Domínguez on January 7 and Oquelí Domínguez on June 15.  Both men were members

of the Municipal Committee in Defense of Common and Public Goods of Tocoa, in the department of Colón. Their family was one of the most prominent environmental defenders of the Guapinol River and surrounding area, in the northern part of the country. The government continued to investigate the killings.

In July, the government signed an agreement establishing a tripartite commission to investigate human rights abuses in the Bajo Aguan area and provide reparations to victims.

Criminal groups, such as drug traffickers and local and transnational gangs including MS-13 and the 18th Street gang, committed killings.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the law prohibited such practices, there were credible reports of abuses by members of the security forces.

The National Human Rights Commission (CONADEH) reported 66 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners

by security forces through August, while the Public Ministry received five such reports through July. The quasi-governmental National Committee for the Prevention of Torture, Cruel, Inhuman, or Degrading Treatment (CONAPREV) received 41 complaints of the use of torture or cruel and inhuman treatment through September.

Corruption, a lack of investigative resources, and judicial delays led to widespread impunity, including for members of security forces.

## Prison and Detention Center Conditions

Prison conditions were harsh and at times life threatening due to gross overcrowding, malnutrition and lack of medical care, and abuse by prison officials. The government's failure to control criminal activity and pervasive gang-related violence contributed significantly to insecurity.

**Abusive Physical Conditions:** Prisons were severely overcrowded. CONAPREV reported that as of March 31, the prison population was more than 19,500, in a system designed for approximately 13,000 inmates.

Prisoners suffered from malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting.

CONADEH and CONAPREV reported more than 100 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces.

The government failed to control pervasive gang-related violence and criminal activity within the prisons.  Many prisons lacked sufficient security personnel.  Prisoners had access to weapons and other contraband, inmates attacked other inmates with impunity, and inmates and their associates outside prison threatened prison officials and their families.

On June 21, members of the 18th Street gang attacked members of a rival gang, MS-13, in the Tamara women's prison, San Pedro Sula.  Forty-six women were killed.  Following the attack, President Castro transferred control of the prison system to the military police.

**Administration:**  The judicial system was legally responsible for monitoring prison conditions.  The government tasked CONAPREV with visiting prisons and making recommendations for protecting the rights of prisoners.

**Independent Monitoring:**  After the government ordered an emergency military takeover of prisons following a deadly riot in June in the women's prison, the government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross, with some exceptions.

## d. Arbitrary Arrest or Detention

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court.  While no official statistics were provided, there were allegations of

arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

## Arrest Procedures and Treatment of Detainees

By law, police could make arrests only with a warrant unless they made the arrest during the commission of a crime, there was strong suspicion that a person had committed a crime and might otherwise evade criminal prosecution, or they encountered a person in possession of evidence related to a crime.  The law required police to inform persons of the grounds for their arrest and bring detainees before a competent judicial authority within 24 hours.  It stipulated that a prosecutor had 24 additional hours to decide if there was probable cause for indictment, whereupon a judge had 24 more hours to decide whether to issue a temporary detention order.  Such an order could be effective for up to six days, after which the judge was required to hold a pretrial hearing to examine whether there was probable cause to continue pretrial detention.  The law allowed bail for persons charged with some felonies and gave prisoners the right of prompt access to family members.  The law allowed the release of other suspects pending formal charges, on the condition that they periodically reported to authorities, although management of this reporting mechanism was often weak.  The government generally respected these provisions.

Persons suspected of any of 21 specific felonies remained in custody, pending the conclusion of judicial proceedings against them.  Some judges

ruled that such suspects could be released on the condition they report periodically to authorities.  The law granted prisoners the right to prompt access to a lawyer of their choice and, if indigent, to government-provided counsel, although the public defender mechanism was weak, and authorities did not always abide by these requirements.

**Arbitrary Arrest:**  CONADEH and the Public Ministry did not report any statistics on cases of illegal detention or arbitrary arrest.  Nongovernmental organizations (NGOs) reported three cases of arbitrary arrest.  There were also allegations of arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

Guapinol defender Arnol Aleman was detained for 26 hours, despite having a provisional release letter.

**Pretrial Detention:**  Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem.  For crimes with minimum sentences of six years' imprisonment, the law authorized pretrial detention of up to two years.  The prosecution could request an additional six-month extension, but many detainees remained in pretrial detention much longer, including for more time than the maximum period of incarceration for their alleged crime.  The law did not authorize pretrial detention for crimes with a maximum sentence of five years or less.

The law mandated that authorities release detainees whose cases had not yet come to trial and whose time in pretrial detention already had exceeded the maximum prison sentence for their alleged crime. Nonetheless, many prisoners remained in custody after completing their full sentences, and sometimes even after an acquittal, because officials failed to process their releases expeditiously.

## e. Denial of Fair Public Trial

The law provided for an independent judiciary, but the justice system was poorly staffed, inadequately equipped, often ineffective, and subject to intimidation, corruption, politicization, and patronage. Low salaries and a lack of internal controls rendered judicial officials susceptible to bribery. Powerful special interests, including criminal groups, exercised influence on the outcomes of some court proceedings.

### Trial Procedures

The law provided for the right to a fair and public trial; however, the judiciary was often slow to enforce this right.

Credible observers noted problems in trial procedures, such as a lack of admissible evidence, judicial corruption, witness intimidation, and an ineffective witness protection program.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the law generally prohibited such actions, a legal exception allowed government authorities to enter a private residence to prevent a crime or in case of an emergency. On December 6, the Office of the UN High Commissioner for Human Rights expressed concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.

# Section 2. Respect for Civil Liberties

# a. Freedom of Expression, Including for Members of the

# Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, with some restrictions, and the government generally respected this right.  Although many press outlets were politically aligned, the press and prevailing democratic norms combined to promote freedom of expression, including for media members.

**Freedom of Expression:**  Senior government representatives criticized civil society and members of the international community for comments perceived as critical of the government.  Civil society groups reported these statements had a chilling effect on freedom of expression.

**Violence and Harassment:**  Journalists and other members of civil society reported they self-censored due to fear of criticism, harassment, and retribution by the government and its supporters.  Others reported direct acts of intimidation or threats of violence from government officials or supporters for being critical of the government.  For example, National Police agents intimidated journalist Orlin Martinez, claiming he was an informant for criminal groups.  Civil society organizations criticized the government's failure to investigate threats and incidents of violence adequately.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Media members and NGOs stated the

press self-censored due to fear of retaliation from criminal groups, drug trafficking organizations, or criticism by government officials. Media also engaged in self-censorship to avoid losing lucrative advertising contracts with the government.

**Libel/Slander Laws:** Libel and slander were criminal offenses. No cases were reported during the year.

**Nongovernmental Impact:** Some journalists and other members of civil society reported threats from members of criminal groups. It was unclear how many of these threats were related to the victims' professions or activism. For example, on January 30, unknown assailants shot and killed television media editor Carlos Barahona in Tegucigalpa. On December 22, unknown assailants shot and killed social communicator Javier Ramírez Amador in the city of Danlí. Ramírez worked for Channel 24 primetime television and the Public Prosecutor's Office and had been receiving police protection since May under the National Protection Mechanism. The police officer protecting Ramírez was also shot during the attack. NGOs believed the killing was reprisal for Ramirez's work investigating criminal activities. The government continued to investigate the killing.

Several anonymous social media sites criticized journalists (as well as activists and civil society organizations) who were critical of the government or of opposition party policies.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

# b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, but the government did not always respect the right of peaceful assembly, due to a continued estado de excepción beginning in November 2022, in which these rights were suspended.

## Freedom of Peaceful Assembly

On May 9, citizens marched in a peaceful protest in the southern city of Choluteca against tax law reforms proposed by the governing LIBRE party. In response, the Castro administration convened a meeting of the National Defense and Security Council, condemned the protest, and ordered an investigation, claiming the protesters had been coerced by business owners into participating in the protest. The government promised to prosecute those involved, based on the allegation the march organizers coerced protesters to participate. As of September, police and other justice sector officials had yet to publicly identify any of the protest leaders as having committed a crime.

In another instance, in July supporters of the ruling party chased peaceful

protesters while throwing objects at them to disrupt their demonstration. The government also reportedly used its control of the Honduran Transportation Institute to arbitrarily enforce intercity bus travel rules in August to reduce numbers of protesters at another opposition-led protest in Tegucigalpa.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:** There were areas where authorities could not assure freedom of movement due to criminal activity and a lack of significant government presence.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing

EOIR — 23 of 70

protection and assistance to refugees, returning refugees, or asylum
seekers, and other persons of concern.

**Access to Asylum:**  The law provided for granting asylum or refugee status.
The government had a nascent system to provide legal protection to
refugees.  Its operations to receive and process cases relied on substantial
support from UNHCR.  UNHCR's support focused on providing training to
officers of the National Institute for Migration, supporting decisions on
submitted claims, and improving reception conditions for asylum seekers.

**Abuse of Refugees and Asylum Seekers:**  Transiting migrants, forcibly
displaced populations, and asylum seekers with pending cases were
vulnerable to abuse and sexual exploitation by criminal organizations.
Women, children, and lesbian, gay, bisexual, transgender, queer, or intersex
(LGBTQI+) individuals were especially vulnerable to abuse.  Transiting
migrants, refugees, and other vulnerable populations faced acute security
risks in border zones.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated that between 2004
and 2018 (most recent data available), there were approximately 247,000
IDPs due to violence in the country.  Gang activity, including attacks on and
exploitation of nonmembers, was the primary contributor to violence-

related internal displacement. Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities. NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

The government maintained the Interinstitutional Commission for the Protection of Persons Displaced by Violence and created the Directorate for the Protection of Persons Internally Displaced by Violence within the Ministry of Human Rights. Despite incremental progress, government capacities to respond to the needs of IDPs was limited.

In March President Castro enacted the Law for the Prevention, Care, and Protection of Internally Displaced People, created to provide a legal framework to protect the rights of IDPs.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center at https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

The law provided citizens the right to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal

and equal suffrage. The law did not permit active members of the military or civilian security forces to vote. The constitution prohibited practicing clergy from running for office or participating in political campaigns.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** The most recent national elections, held in November 2021, were generally considered to be fair and free of abuses and irregularities. Some NGOs and political parties reported irregularities, but international observers reported they were not systematic and not widespread enough to affect the outcome of the presidential election.

# Section 4. Corruption in Government

The law provided for criminal penalties for corruption by officials, but authorities did not implement the law effectively, and officials continued to engage in corrupt practices with impunity. There were numerous reports of government corruption.

**Corruption:** On May 23, the Special Prosecutor's Office for the Protection of Children reported it had received official complaints filed against the former director of the Directorate for Children, Adolescents, and the Family, Dulce Villanueva, for irregular adoption proceedings and alleged collection of bribes. On May 26, President Castro accepted her resignation.

For additional information regarding corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report,* which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings.  Government officials were somewhat cooperative and responsive to the views of these groups, but some human rights organizations criticized government officials for lack of access and responsiveness.

**Retribution against Human Rights Defenders:**  The Public Ministry reported eight killings of human rights and environmental activists as of September.  For example, on January 7, Aly Domínguez and Jairo Bonilla were shot and killed by unknown assailants.  Domínguez and Bonilla were cofounders of a grassroots resistance protesting a controversial open-pit iron oxide mining project that was polluting a river that runs through the Bajo Aguán valley in northern part of the country.  On June 15, Oqueli Domínguez, Aly's brother,

was shot and killed in similar circumstances.  The government continued to investigate the killings.

**Government Human Rights Bodies:**  A semiautonomous commission for human rights, CONADEH, investigated complaints of human rights abuses. NGOs and other civil society groups generally considered the commission independent but at times ineffective.

The Ministry of Human Rights served as an advocate for human rights within the government.  The Public Ministry's Office of the Special Prosecutor for Human Rights handled cases involving charges of human rights abuses by government officials.  The Public Ministry also had a Special Prosecutor's Office for the Protection of Human Rights Defenders, Journalists, Social Communicators, and Justice Officials.  There was also a Human Rights Commission in the national congress.  The Ministries of Security and of Defense both had human rights offices that coordinated human rights-related activities with the Ministry of Human Rights.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized all forms of rape, including spousal rape and domestic or intimate partner rape and other forms of domestic and sexual violence, as well as so-called corrective rape of

LGBTQI+ persons. The government considered rape a crime of public concern, and the state prosecuted suspected rapists even if survivors did not press charges. The penalties for rape ranged from nine to 13 years' imprisonment. The law was not effectively enforced; weak public institutional structures contributed to the inadequate enforcement.

The law did not specifically criminalize domestic violence but provided penalties of up to 12 years in prison for violence against a family member, depending on the severity of the assault and aggravating circumstances. If a victim's physical injuries did not reach the severity required to categorize the violence as a criminal act, the legal penalty for a first offense was a sentence of one to three months of community service.

Survivors of domestic violence were entitled to certain protective measures, such as removing the abuser from the home and prohibiting the abuser from visiting the victim's workplace or other frequently visited locations. Persons who disobeyed the prohibition could be detained for up to 24 hours as a preventive measure. The law provided a maximum sentence of three years in prison for disobeying a restraining order connected with the crime of violence against a woman.

Civil society groups reported women often did not report domestic violence or withdrew charges because they feared, or were economically dependent on, the aggressor. In addition, women experienced delays in accessing justice due to police who failed to process complaints in a timely manner or

judicial system officials who deferred scheduling hearings.

**Other Forms of Gender-based Violence or Harassment:** The Ministry of Security reported 229 violent women deaths from January to June, a nearly 49 percent increase compared with the same period in 2022. The Human Rights Observatory of the Center for Women's Rights registered 341 violent deaths of women as of October 31.

The law criminalized sexual harassment, including in employment. The law stipulated penalties of one to three years in prison and possible suspension of offenders' professional licenses, but the government did not effectively enforce the law.

**Discrimination:** Although the law accorded women and men the same legal rights and status, including property rights in divorce cases, many women did not fully enjoy such rights due to barriers in access to justice and lack of information regarding legal protections. Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections. The law did not mandate equal pay for equal work. The law prohibited employers from requiring pregnancy tests as a prerequisite for employment. The law stated a woman's employment should be appropriate to her physical state and capacity. Many employers discriminated against women. For example, it was common in job announcements that only male applicants should apply.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government did not provide government-sponsored access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were not available as part of clinical management of rape.  President Castro signed an executive order in March allowing the sale, distribution, and use of emergency contraception, but it was not widely available.  The government's ability to provide health-care services to survivors of sexual violence was limited.  Survivors relied on assistance from NGOs such as Doctors Without Borders.

In 2019 (most recent data available), 94 percent of births were attended by skilled health-care personnel; however, NGOs reported significant gaps in obstetric care, especially in rural areas.  The United Nations reported the adolescent birth rate was 89 births per 1,000 girls ages 15 to 19.  UN human rights experts stated the difficulty of access to contraception, particularly in rural areas, contributed to a high rate of adolescent pregnancy.

The Ministry of Health estimated that there were 86 maternal deaths per year and that the vast majority of the leading causes were preventable.

## Systemic Racial or Ethnic Violence and Discrimination

The law criminalized discrimination based on race and ethnicity and

included crimes committed against individuals due to race or ethnicity as aggravating circumstances to increase penalties for other criminal offenses. NGOs reported the government did not effectively combat discrimination or promote equal access to government services and employment opportunities.

The government's National Policy to Combat Racism and Racial Discrimination sought to promote equality and combat discrimination related to the country's two Afro-descendent groups, with a focus on social and political participation; access to education, health care, justice, and employment opportunities; and rights to ancestral lands and natural resources. NGOs reported the government did not make sufficient efforts to comply with Inter-American Court of Human Rights rulings, specifically cases related to territorial rights for Garífuna communities.

## Indigenous Peoples

Indigenous groups had limited representation in the national government and consequently little direct input into decisions affecting their lands, cultures, traditions, and the allocation of natural resources.

Indigenous communities continued to report threats and acts of violence against them and against community and environmental activists. Violence was often rooted in a broader context of conflict regarding land and natural resources, corruption, lack of transparency and community consultation,

other criminal activity, and limited state ability to protect the rights of vulnerable communities.

Ethnic minority rights leaders, international NGOs, and farmworker organizations claimed the government failed to redress actions taken by security forces, government agencies, private individuals, and businesses to dislodge Indigenous persons from lands over which they claimed ownership based on land reform law or ancestral land titles.

Persons from Indigenous and Afro-descendant communities experienced discrimination in employment, education, housing, and health services.

As of September, there was no conclusion after evidence hearings in June regarding the November 2022 killing of Marcos Pineda Aguilar during a police raid in the community of El Encinal, department of La Paz. National Police agents allegedly killed the victim, a member of the Civic Council of Popular and Indigenous Organizations of Honduras. The hearings relied on police testimony.

## Children

**Birth Registration:** Failure to register births resulted in denial of public services, including access to health services or school enrollment.

**Child Abuse:** The law established prison sentences of up to two and one-half years for child abuse. The government did not enforce the law

effectively.

**Child, Early, and Forced Marriage:**  The minimum legal age of marriage was 18.  The government did not enforce the law effectively.  International NGOs reported 34 percent of girls and 12 percent of boys were married before age 18, with the practice more prevalent in rural areas.  Most unions were informal rather than a formal marriage.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking.  The commercial sexual exploitation of children, especially in sex trafficking, was a problem, and the government made efforts to enforce the law, but its measures were not effective.  The country was a destination for child sex tourism, particularly in the tourist area of the Bay Islands.  The legal age of consent was 18.  The law prohibited the use of children younger than 18 for exhibitions or performances of a sexual nature or in the production of pornography.

## Antisemitism

The Jewish community numbered approximately 150 members.  There were no known reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws existed to criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior.  NGOs reported concern that the Public Ministry and government bodies lacked investigative processes to deal with cases of violence and hate crimes against LGBTQI+ persons, because investigative units did not receive training on gender and sexual diversity issues.  There was also a general lack of investigative personnel, contributing to a large number of unresolved cases.

**Violence and Harassment:**  NGOs reported police or other government agents incited, perpetrated, condoned, or tolerated violence against LGBTQI+ individuals.  Impunity for such crimes was high.  LGBTQI+ organizations reported they were the target of hate speech from media, public officials, and religious organizations.  The Public Ministry reported seven killings of LGBTQI+ persons as of September, while NGOs reported 47 violent deaths and 83 hate crimes against LGBTQI+ persons as of November.

On January 29, the Special Prosecutor's Office for Crimes Against Life

coordinated a raid in Roatán to capture Erick Gerardo del Arca, for the alleged rape and killing of Manuel Enrique Cruz, a member of the LGBTQI+ community.

In June police detained Miguel Ángel Cabrera Oviedo and Antonio Josué Medina Vargas for the February 19 killing of Maryuri Lizeth Pineda, a member of the LGTBQI+ community.

On May 18, a member of the National Police assigned to Intibucá Departmental Police Unit 13 of the municipality of Gracias, department of Lempira, reported Deputy Commissioner Jessica Aguilar for harassment regarding his sexual orientation.

**Discrimination:** The law prohibited discrimination based on sexual orientation and gender identity characteristics and included crimes committed against individuals because of their sexual orientation or gender identity as aggravating circumstances to increase penalties for criminal offenses. Nevertheless, discrimination against LGBTQI+ persons persisted. As of August, CONADEH received 25 reports of discrimination based on sexual orientation. Same-sex couples and households headed by same-sex couples were not eligible for the same legal protections available to opposite-sex married couples.

LGBTQI+ rights groups asserted government agencies and private employers engaged in discriminatory hiring practices. Transgender women were

particularly vulnerable to employment and education discrimination; many could find employment only as sex workers, increasing their vulnerability to violence and extortion.

**Availability of Legal Gender Recognition:**  The law prohibited transgender persons from changing their name and legal gender status.  Other forms of legal gender recognition, such as nonbinary or intersex, were not available.

**Involuntary or Coercive Medical or Psychological Practices:**  There were no documented cases of "conversion therapy," but NGOs reported there were known cases of conversion therapies.  There were no reports medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:**  There were no restrictions of freedom of expression, association, or peaceful assembly regarding LGBTQI+ matters or events.

## Persons with Disabilities

The law required that persons with disabilities have access to buildings, but few buildings were accessible, and the government did not effectively implement laws or programs to provide such access.

According to government estimates, children with disabilities attended school at a lower rate than the general population.  The Institute for

National Statistics put net enrollment for primary school at 77 percent in 2021, but the National Center for Social Sector Information stated that in 2020, 43 percent of persons with disabilities received no formal education.

The government had an Office for Persons with Disabilities located within the Ministry of Development and Social Inclusion, but its ability to provide services to persons with disabilities was limited.

## Other Societal Violence or Discrimination

Persons with HIV and AIDS continued to be targets of discrimination, including in employment and occupation, and they suffered disproportionately from gender-based violence.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law granted workers the right to form and join unions of their choice, bargain collectively, and strike.  It prohibited employer retribution against employees for engaging in trade union activities.  The law placed restrictions on these rights, such as requiring that a recognized trade union represent at least 30 workers, prohibiting foreign nationals from holding union offices, and requiring that union officials work in the same substantive area of the

business as the workers they represented. The law prohibited members of the armed forces and police, as well as certain other public employees, from forming labor unions. The Ministry of Labor and Social Security also required that union leaders be employed under permanent contracts, limiting the ability of seasonal agricultural workers to exercise their right to freedom of association.

The law required an employer to begin collective bargaining once workers established a union, and it specified that if more than one union existed at a company, the employer had to negotiate with the largest.

The law allowed only local unions to call strikes, prohibited labor federations and confederations from calling strikes, and required that a two-thirds majority of both union and nonunion employees at an enterprise approve a strike. The law prohibited workers from legally striking until direct negotiations and government-accompanied mediation and conciliation had failed. The Ministry of Labor had the power to declare a work stoppage illegal and grant employers the ability to discipline employees consistent with their internal regulations, including by firing strikers. In addition, the law limited strikes in sectors the government designated as essential services but did not necessarily meet the criteria for essential services. The law required workers in public health care, social security, staple food production, and public utilities (municipal sanitation, water, electricity, and telecommunications) to provide basic services during a strike. The law also

required that public-sector workers involved in the refining, transportation, and distribution of petroleum products submit their grievances to the Ministry of Labor.  The law permitted strikes by workers in export-processing zones and free zones for companies that provided services to industrial parks, but it required that strikes not impede the operations of other factories in such parks.

The government did not effectively enforce the law.  Employers frequently refused to comply with Ministry of Labor orders that required them to reinstate workers who had been dismissed for participating in union activities.  The Ministry of Labor could order a company to reinstate workers, but the ministry lacked the personnel and transportation resources to verify compliance.  By law, the ministry could fine companies that violated the right to freedom of association.  The law permitted fines, and the penalty was commensurate with those for other laws involving denials of civil rights, such as discrimination.  Penalties were sometimes applied against violators, but the failure of the government to collect fines facilitated continued violations.  During the year, the government issued the highest penalty ever against an employer in a long outstanding case of violation of freedom of association and other labor law violations.

Workers had difficulty exercising the right to form and join unions and to engage in collective bargaining.  Public-sector trade unionists raised concerns regarding government interference in trade union activities,

including its ignoring or suspending collective agreements and its dismissals of union members and leaders.

Some employers either refused to engage in collective bargaining or made it very difficult to do so. Some companies also delayed appointing or failed to appoint representatives for required Ministry of Labor-led mediation, a practice that prolonged the mediation process and impeded the right to strike. Unions also raised concerns that employers used temporary contracts to prevent unionization and to avoid providing full benefits.

The government investigated violence and threats of violence against union leaders. Impunity for such crimes was high.

On June 24, unknown assailants shot and killed 13 persons in Choloma, department of Cortés. Most of the victims were not union members; however, union leaders and maquila workers in Choloma, including the president of the Gildan San Miguel Workers' Union, were among the victims. The shooting was preceded by an announcement that Gildan Activewear planned to shut down its factory in Choloma, which led to threats against the union leaders from local gang members, who blamed the union for the closure and loss of employment. The company noted the closure was strictly due to market conditions, reiterated its commitment to freedom of association and collective bargaining, and continued to engage with the union. In June authorities arrested three suspects in relation to the shooting – Javier Antonio Colindres Hernández, José Andrés Hernández Gutiérrez, and

an unnamed minor member of the Barrio 18 gang.  It was unclear whether the shooting was related to union activity.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provided for a minimum wage for most sectors.  There were 45 categories of monthly minimum wage, based on the industry and the size of a company's workforce; minimum wages were above the poverty line.  The minimum wage law did not cover domestic workers, the vast majority of whom were women.

The law prescribed a maximum eight-hour shift per day for most workers, a 44-hour workweek, and at least one 24-hour rest period for every six days of

work.  It also provided for paid national holidays and annual leave.  The law required overtime pay, banned excessive compulsory overtime, limited overtime to four hours a day for a maximum workday of 12 hours, and prohibited the practice of requiring workers to complete work quotas before leaving their place of employment.

In some industries, including agriculture, domestic service, and security, employers did not respect maternity rights or pay minimum wage, overtime, or vacation.  In these sectors, employers frequently paid workers for the standard 44-hour workweek irrespective of any additional hours they worked.  In the security and domestic service sectors, workers were frequently forced to work more than 60 hours per week but were paid only for 44 hours.  Employers frequently penalized agricultural workers for taking legally authorized days off.  Employers paid the minimum wage inconsistently in other sectors.  Civil society continued to raise problems with minimum wage violations, highlighting agricultural companies in the south as frequent violators.

On July 25, the Ministry of Labor modified a 2018 agreement on Honduran Maquiladora Textile Sector and other Free Zone Companies to increase the minimum wage for maquila workers by 10 percent.

**Occupational Safety and Health:**  Occupational safety and health (OSH) standards were appropriate for the main industries in the country, and OSH experts actively identified unsafe conditions, in addition to responding to

workers' OSH complaints. By law, workers could remove themselves from situations that endangered their health or safety without jeopardizing continued employment. Under the inspection law, the Ministry of Labor had the authority to temporarily shut down workplaces where there was an imminent danger of fatalities. Enforcement of OSH standards was particularly weak in the construction, garment assembly, and agricultural sectors, as well as in the informal economy.

**Wage, Hour, and OSH Enforcement:** The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws, but it did so inconsistently and ineffectively. Penalties for violations of OSH law were commensurate with penalties for similar crimes but rarely applied against violators and rarely collected.

The law permitted fines for wage and hour violations; these were commensurate with the penalties for similar crimes, such as fraud. The government sometimes applied penalties against violators, but failure to collect fines facilitated wage and hour violations. The Ministry of Labor had an insufficient number of inspectors to enforce the wage, hour, and OSH laws effectively. Inspectors had the authority to make unannounced inspections and initiate sanctions.

While all formal workers were entitled to social security, there were reports that both public- and private-sector employers failed to pay into the social security system. The Ministry of Labor could levy a fine against companies

that failed to pay social security obligations, but the amount was not sufficient to deter violations.

According to 2021 Ministry of Labor data, approximately 75 percent of workers worked in the informal economy.  The government did not enforce the labor laws in this sector since these workers were not protected by the labor code.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Page 44 of 69

**AMNESTY INTERNATIONAL**
INTERNATIONAL SECRETARIAT

www.amnesty.org



# HONDURAS: INSUFFICIENT HUMAN RIGHTS PROGRESS

### AMNESTY INTERNATIONAL:
### SUBMISSION TO THE 50TH SESSION OF THE UPR WORKING GROUP, NOVEMBER 2025

## SUMMARY

This submission was prepared for the Universal Periodic Review (UPR) of Honduras in November 2025. In it, Amnesty International evaluates the implementation of recommendations made to Honduras in its previous review, including in relation to the protection of human rights defenders and journalists and sexual and reproductive rights.

It also assesses the national human rights framework with regard to the criminal code, particularly the amendment of the crime defined as "usurpation," which has been identified by the IACHR and civil society organizations as increasing the risk of criminalization, and highlights treaties pending signing or ratification.

With regard to the human rights situation on the ground, Amnesty International raises concern about excessive use of force and other alleged human right violations perpetrated during the prolonged state of emergency since 2022; detention conditions; and the situation of human rights defenders, Indigenous Peoples and journalists. The report also addresses discrimination against LGBTI people, the abortion ban and limitations to the right to health.

It ends with a set of recommendations to Honduras which, if implemented, would contribute to improving the human rights situation.

© Amnesty International 2025; INDEX AMR 37/9180/2025, April 2025
LANGUAGE: ENGLISH. Except where otherwise noted, content in this
document is licensed under a Creative Commons (attribution, non-
commercial, no derivatives, international 4.0) licence.

https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode

For more information, please visit the permissions page on our website:
www.amnesty.org

Where material is attributed to a copyright owner other than Amnesty
International this material is not subject to the Creative Commons
licence.

Amnesty International is a global movement of more than 10
million people who campaign for a world where human rights are
enjoyed by all.

Our vision is for every person to enjoy all the rights enshrined in
the universal declaration of human rights and other international
human rights standards.

We are independent of any government, political ideology,
economic interest or religion and are funded mainly by our
membership and public donations.



## FOLLOW UP TO THE PREVIOUS REVIEW

1. During its third review in 2021, Honduras received 223 recommendations, supporting 203.[i] It noted 20 recommendations related to sexual and reproductive rights, same sex marriage, fight against corruption issues, and treaties pending signing or ratification.[ii]

2. Despite supporting recommendations on the protection of human rights defenders and ensuring an enabling environment for them[iii], human rights defenders continue to face high levels of violence. Honduras has the highest number of land and environmental defenders killed per capita in the world, according to Global Witness.[iv]

3. Honduras also supported one recommendation on demilitarization of public security duties.[v] However, it has not been implemented yet.

4. In a welcome move, despite noting recommendations on access to emergency contraception pill, Honduras allowed the use and sale of this pill, ending 14 years of prohibition. This contributes to the protection, promotion and respect for the rights of women, girls and people who can become pregnant.

## THE NATIONAL HUMAN RIGHTS FRAMEWORK

5. Decree 93-2021 introduced the criminal offense of preventive eviction without a court order, and brought in other amendments to the criminal code that have led to the criminalization of human rights defenders.

6. In 2024, Honduras ratified the Inter-American Convention to Prevent and Punish Torture.

7. That same year, the UN Committee Against Torture recommend several adjustments to article 216 of the Criminal Code, that typifies the crime of torture.[vi]

8. Honduras has not yet acceded to the Regional Agreement on Access to Information, Public Participation and Access to Justice in Environmental Matters in Latin America and the Caribbean (Escazú Agreement) nor the ILO Domestic Workers Convention (No. 189). It has not accepted the individual complaints procedures under the Convention on the Rights of the Child and the Convention on the Elimination of All Forms of Discrimination against Women.

9. The ombudsperson (Comisionado Nacional de los Derechos Humanos, CONADEH) and the Secretary for Human Rights (part of the executive branch) face budget and capacity challenges to fully accomplish their missions.

## THE HUMAN RIGHTS SITUATION ON THE GROUND

**Use of force**

10. On 6 December 2022 the government implemented a state of emergency and justified it as necessary for combating insecurity and organized crime. This has limited the rights to liberty, freedom of association, assembly and movement, including by allowing the National Police and the Military Public Order Police (PMOP) to carry out search and detentions without judicial authorizations in 226 of the 298 municipalities of Honduras.

Public

Uploaded on 08/15/2025 at 03:38:55 PM (Central Daylight Time), Page 48 of 70

11. Despite concerns raised by civil society organizations (CSOs) about the efficacity of such measures, the government has continuously prolonged the state of emergency, most recently until May 2025. CSOs also pointed out most of these prolongations failed to meet legal national or international requirements to enact states of emergency. For example, several failed to be ratified by Congress, which shows a worrying trend of lack of check and balance control of powers.

12. These uninterrupted extensions have also resulted, in practice, in the PMOP continuing to perform citizen security tasks on a permanent basis, despite the President's initial commitment in favour of demilitarization. Permanent deployment of the armed forces in public security tasks does not comply with international standards and poses a threat to the guarantee of human rights in the country. According to international jurisprudence, maintaining public order and public security should be primarily the responsibility of civilian police forces.

13. CSOs and media outlets[vii] have documented human rights violations and crimes under international law allegedly perpetrated by the National Police, Anti-gangs Police (DIPAMPCO), and PMOP, including arbitrary detention, excessive use of force, torture (including sexual violence), enforced disappearances, and violations of fair trial rights. By October 2024 the Ombudsperson (CONADEH) had received more than 700 complaints against the police and security forces since the start of the state of emergency, and has since called to end the state of emergency.[viii]

14. Despite some slight progress, the majority of human rights violations perpetrated in the context of repression of social movements and protests in the 1980s and between 2009 and 2021 remain unpunished. In January 2025, retired General Romeo Vásquez Velásquez and two other former high-ranking officers were arrested on charges of homicide and serious injuries against demonstrators in 2009 and granted house arrest. However , Vásquez escaped.

15. Between 2023 and 2024 the government took some steps to publicly acknowledge state responsibility for some of these acts, and announced a reparation and no repetition plan.

16. In 2023, following his country visit, the UN Special Rapporteur on extrajudicial executions expressed concern about the widespread and structural impunity of homicides and unlawful killings, limited investigative capacity, and lack of independent and impartial investigations.[ix] The Law on Use of Force is still pending approval.

**Detention conditions**

17. In June 2023 the Military Police re-took control of prisons after 46 women were killed during an alleged riot between rival gangs in the Tamara jail. In 2024 UN experts raised concerns over overcrowding and militarization of prisons. The UN Sub-Committee for the prevention of Torture reported that conditions in many prisons amounted to cruel, inhuman and degrading treatment.[x]

18. Among new counterterrorism measures presented to tackle organized crime, in 2024 the government announced the construction of a "mega prison" and reforms to the criminal code such as collective trials that put at risk due process of law guarantees. As of April 2025, these changes had not been approved.

**Independence of the Judiciary and fight against corruption**

19. Local organizations have warned of continuing threats to the independence of the judiciary. The 2024 selection process for the new Attorney General and Deputy Attorney General was marked by tensions and impasse in the National Congress, with no one appointed by the September 1 due date. A small group of congressmen close to the official political party unilaterally formed a commission that appointed both positions on an interim basis. This was strongly criticised by NGOs, political opposition and constitutional lawyers, who filed legal actions to challenge the nomination.

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public



20. In the 2024 *Gutiérrez Navas et al. vs Honduras* judgement, the Inter American Court of Human Rights (IA Court) declared Honduras was responsible for the arbitrary and illegal dismissal of four of the five judges of the Constitutional Chamber of the Supreme Court of Justice in 2012.

21. In 2022, when President Castro came to power, she reaffirmed her commitment to establish an international anti-corruption mission (CICIH). However, by April 2025, it had still not been installed. Among the obstacles is the lack of progress in legislative reforms required prior to the installation of the CICIH.

**Human rights defenders and journalists**

22. Territory, land and environmental defenders are particularly at risk. They face constant stigmatization, intimidations, killings, and arbitrary detentions.

23. Attacks mainly occur in the context of disputes relating to mining projects, land-tenure insecurity, and violations of the rights of Indigenous Peoples. The vast majority of attacks remain unpunished. Four people of the Municipal Committee for the Defence of Common and Public Goods of Tocoa (CMDBCPT) were killed between 2023 and 2024, including their coordinator Juan López despite he was a beneficiary of precautionary measures of the Inter American Commission on Human Rights (IACHR). By April 2025, investigations remained pending. Garifuna human rights defenders from the Black Fraternal Organization of Honduras (OFRANEH) were particularly at risk.

24. The Supreme Court of Justice upheld sentences against eight men found responsible for the murder of Indigenous defender Berta Cáceres in 2016. In 2023 the authorities issued an arrest warrant for one of the possible instigators of the murder, which remains unenforced to date.

25. Criminal law is regularly misused to harass those who defend the environment and their territories. For instance, eight defenders of the CMDBCP spent almost 2,5 years in pre-trial detention between August 2019 and February 2022. The UN Working Group on Arbitrary Detention declared their detention arbitrary.[xi]

26. In 2021, the IACHR warned about risk of criminalization posed by the offence of "usurpation" resulting from the 2021 reform of the criminal code. The new definition incorporates "unlawfully holding public space" as a form of the offence, which could result in illegitimate restrictions to freedom of expression and peaceful assembly. In addition, the lack of consideration of intent as a requirement to commit a crime may enable discretionary actions by justice operators.[xii] Lawyers and local NGOs indicated that this offense has been regularly used against human rights defenders, such as Garifuna leaders.

27. International and national organizations expressed concerns over the weakness and ineffectiveness of the national protection mechanism for human rights defenders and journalists. The elaboration of a protocol to investigate attacks against them, ordered by the IA Court in the *Escaleras Mejía et al. Vs Honduras* case in 2018, remains pending.

28. Journalists, particularly those covering corruption, organized crime, and environmental issues, face threats, intimidation, aggression, online and offline. This is aggravated by stigmatizing speeches and smear campaigns emanating from public officials and political leaders against grassroot communicators and independent media.

**Indigenous Peoples**

29. In 2024, land recovery for the Garifuna community of Punta Piedra began, as part of the implementation of the ruling by the IA Court.[xiii] However, the vast majority of measures ordered by this tribunal in three different judgements on violations of the collective rights of Garifuna communities remain pending.

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

4

Public

AMNESTY
INTERNATIONAL

**Right to a healthy environment**

30. In 2024, Congress approved Decree 18-2024, which reestablishes the original layout of the Carlos Escaleras National Park and ensures the effective protection of all protected areas in Honduras by prohibiting mining rights in all of them. Implementation is pending.

31. Honduras is one of the most vulnerable countries in the world to climate change. Impacts on the enjoyment of human rights are exacerbated by high rates of poverty and inequality among already marginalized populations. For example, sea level rise and coastal erosion threaten access to water, food, health, and housing for communities in the Gulf of Fonseca and constitutes an additional push factor for forced migration.

32. International experts warned that the implementation of the 2021 National Adaptation Plan is lagging behind.[xiv]

**Sexual and reproductive rights**

33. Abortion remained prohibited in all circumstances. In 2021, Congress passed a constitutional reform that reinforced the absolute prohibition of abortion. In 2023, the government allowed the use and sale of the emergency contraceptive pill. However, access to the pill is hampered due to limited availability at public health facilities.

34. Despite high levels of child and teenage pregnancies, in 2023 the president vetoed the Pregnancy Prevention Act, aimed at providing comprehensive sex education.

**Gender based violence and discrimination**

35. According to the National University's observatory, 411 violent deaths and femicides were registered in 2023.[xv] This represents an average of 34 deaths per month, which means a woman might be killed every 21 hours and 18 minutes.

36. Small legislative progresses were made. In 2024 Congress passed a Safe Houses Law for women victims of gender-based violence, which aims at perpetuating the existence of these structures, often managed by civil society. However, the Integral Law against Violence against Women Bill is still pending.

37. LGBTI people continued to face violence and discrimination. The NGO Cattrachas registered at least 52 violent deaths in 2023. Impunity is widespread for these crimes.

38. Same-sex marriage remains prohibited. In 2021, Congress passed a constitutional reform that reinforced this prohibition.

39. In 2021 the IA Court found Honduras responsible for the killing of trans activist Vicky Hernández in 2009, and that Honduras had failed to adequately investigate her death and discriminated against her. Compliance of the judgement is still pending; for instance, authorities have not adopted a procedure for the recognition of the gender identity of non-binary persons.

**Right to health**

40. There are major challenges for people's access to healthcare. According to the World Health Organization (WHO), there were an average of 6.6 beds per 10,000 inhabitants in 2023. This figure represents less than a third of the regional average (21 per 10,000 inhabitants).[xvi]

41. Public spending on health as a percentage of GDP in Honduras was 3.4% in 2022[xvii], and has remained around these levels for the last five years. This is well below the 6% recommended by the Panamerican Health Organization (PAHO) and WHO in order to provide universal coverage to the poorest groups. Out-of-

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

amnesty.org

Public



pocket spending, assumed by households, was over 51% of current health spending[xviii], while the average for Latin America is 30.6%.

## RECOMMENDATIONS FOR ACTION BY THE STATE UNDER REVIEW

**Amnesty International calls on the government of Honduras to:**

**Use of force**

42. End the two years state of emergency, which does not comply with international human rights standards.

43. Ensure prompt, impartial, independent and effective investigations into all cases of unnecessary and excessive use of force in the context of protests in 2017 and 2019, during the COVID-19 pandemic and the recent state of emergency, by independent bodies different from those of the alleged perpetrators.

44. Guarantee full reparations for the victims and their families.

**Detention conditions**

45. End military control of penitentiary facilities and in general refrain from deploying the army or the Military Police in public security tasks. The use of the armed forces in public security tasks, must be exceptional, temporary and restricted to what is strictly necessary, under the direction of civil authorities, and supervised by relevant civilian bodies.

46. Ensure conditions of detention compatible with human dignity, and ensure prompt, impartial, independent and effective investigations into all cases of torture or cruel, inhumane or degrading treatment.

**Independence of the judiciary**

47. Ensure that judges, magistrates and prosecutors comply with the requirements of independence and impartiality in the exercise of their functions.

48. Expedite the pending measures for the installation of the CICIH, including approving the legislative reforms necessary for the installation of this commission.

**Human rights defenders and journalists**

49. Ensure thorough, prompt, impartial and independent investigations into all attacks, threats and assaults against human rights defenders and journalists, and bring to justice those suspected of criminal responsibility for such crimes in fair trials. In particular, ensure that the investigation into the murder of Juan López is aimed at identifying and bringing to justice all those who ordered the killing.

50. Refrain from misusing the justice system to intimidate, harass and discredit human rights defenders, and initiate prompt, thorough and impartial disciplinary and criminal investigations, as appropriate, against authorities that misuse the justice system to criminalize human rights defenders.

51. Ensure authorities have sufficient resources for the effective protection of human rights defenders and journalists, and in particular strengthen the National Protection Mechanism.

52. Reform the crime of usurpation in the Penal Code and ensure that it complies with international human rights law and standards on freedom of expression, peaceful assembly and right to defend human rights.

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

Public



53. Accede the Escazu Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean.

**Indigenous Peoples' rights**

54. Address structural causes of social conflicts related to the exploration and exploitation of natural resources, on the basis of respect for the human rights of Indigenous Peoples and Afro-descendant communities, and in particular, ensure an inclusive and meaningful consultation process with them on any law or regulation to implement their right to free, prior and informed consent.

55. Implement reparations measures in favour of Garifuna communities ordered by the IA Court, including granting them collective property titles.

**Right to a healthy environment**

56. Ensure the prompt implementation of Decree 18-2024.

57. Adopt and implement adaptation measures compatible with human rights, ensuring the participation of affected people in decision-making, and provide sufficient resources for all initiatives to strengthen climate governance.

**Sexual and reproductive rights**

58. Decriminalize abortion in all circumstances, and ensure access to abortion in law and in practice for women, girls and all people who can become pregnant.

59. Guarantee access to the emergency contraceptive pill, and to Comprehensive Sex Education, without discrimination.

**Gender base violence and discrimination**

60. Take measures to address the high levels of violence against women and girls, including passing the Integral Law against Violence against Women Bill.

61. Ensure the right to equality and non-discrimination for all persons without distinction; in particular adopt all measures, including legal reforms, to recognize marriages and partnerships between same-sex couples.

62. Conduct exhaustive investigations into all crimes and human rights violations committed against LGBTI people with the aim of identifying, prosecuting and punishing those responsible. The investigation lines should include those aimed at determining whether the crimes were committed on the basis of the victim's sexual orientation and/or gender identity.

63. Adopt legislation that guarantees the recognition of the gender identity of transgender persons through self-determination and simple and expeditious procedures, in accordance with the IA Court's Vicky Hernandez judgement.

**Right to health**

64. Increasing public spending on health to at least 6% of GDP.

65. Prioritize resource allocation to reduce disparities in coverage, particularly for disadvantaged groups that disproportionately cover their health needs with out-of-pocket spending.

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

**AMNESTY
INTERNATIONAL**

## ANNEX 1

## KEY AMNESTY INTERNATIONAL DOCUMENTS FOR FURTHER REFERENCE

Honduras: Justice for water defender killed, 31 October 2024,
https://www.amnesty.org/en/documents/amr37/8705/2024/en/

Honduras, 'They are waiting for us to give up': Activists face harassment and killings in campaign to protect rivers in Honduras, 27 January 2024, https://www.amnesty.org/en/latest/news/2024/01/activists-harassment-killings-protect-rivers-honduras/

A year on, Honduras' 'Bukele-like' approach to security is putting everybody in danger, 11 December 2023, https://www.amnesty.org/en/latest/news/2023/12/honduras-bukele-like-approach-to-security/

Any Tidal wave could drown us: Stories form the climate crisis, 3 November 2022, p.27.
https://www.amnesty.org/es/documents/ior40/6145/2022/es/

Desigual y Letal: Cinco claves para recuperarse de la crisis de derechos humanos que desató la pandemia en América Latina y el Caribe (Spanish only), 27 de abril de 2022, https://www.amnesty.org/es/documents/amr01/5483/2022/es/

Honduras: Amnesty International condemns conviction of six of the 'Guapinol eight', 9 February 2022, https://www.amnesty.org/en/latest/news/2022/02/honduras-amnesty-international-condemns-conviction-six-guapinol-eight/

Honduras: Conviction of David Castillo is a step towards justice, but full truth must be uncovered, 5 July 2021, https://www.amnesty.org/en/latest/news/2021/07/honduras-conviction-of-david-castillo-is-a-step-towards-justice-but-full-truth-must-be-uncovered-2/

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

AMNESTY
INTERNATIONAL

## ANNEX 2

## MATRIX OF RECOMMENDATIONS FROM THE PREVIOUS CYCLE, WITH COMMENTS ON PROGRESS

| Recommendation | Position | Full list of themes | Amnesty International's assessment/comments on level of implementation |
|---|---|---|---|
| **Theme: National Human Rights Institution (NHRI)** | | | |
| 104.17 Continue efforts to strengthen the functioning of national human rights institutions and mechanisms (Nepal); **Source of Position:** A/HRC/46/12/Add.1 - Para.9 | Supported | - National Human Rights Institution (NHRI) **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS | Partially implemented See para. 9 |
| 104.18 Continue to provide adequate resources to the National Commissioner for Human Rights (Pakistan); **Source of Position:** A/HRC/46/12/Add.1 - Para.9 | Supported | - National Human Rights Institution (NHRI) **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS | Partially implemented See para. 9 |
| **Theme: Equality & non-discrimination** | | | |
| 104.28 Adopt comprehensive anti-discrimination legislation that addresses direct and indirect discrimination and encompasses all the prohibited grounds of discrimination, including sexual orientation and gender identity (Iceland); **Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Equality & non-discrimination - Legal & institutional reform - Constitutional & legislative framework **SDGs:** - 10 - REDUCED INEQUALITIES - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | Not implemented See Para 36, 37, 38 |
| 104.30 Take further measures to protect lesbian, bisexual, transgender and intersex persons (Italy); **Source of Position:** A/HRC/46/12/Add.1 - Para.10 | Supported | - Equality & non-discrimination - Sexual & gender-based violence **SDGs:** - 10 - REDUCED INEQUALITIES - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | Not implemented See Para 36, 37, 38 |
| 104.31 Take concrete steps towards eliminating discrimination based on sexual orientation and gender identity (Montenegro); Take further steps towards eliminating discrimination based on sexual orientation and gender identity (Timor-Leste); **Source of Position:** A/HRC/46/12/Add.1 - Para.10 | Supported | - Equality & non-discrimination **SDGs:** - 10 - REDUCED INEQUALITIES - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | Not implemented See Para 36, 37, 38 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

9
Page 53 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.34 Strengthen the institutional human rights framework to eliminate all forms of violence and discrimination on grounds of sexual orientation, sexual identity and gender expression (Chile); **Source of Position:** A/HRC/46/12/Add.1 - Para.10 | Supported | - Equality & non-discrimination<br>- Legal & institutional reform<br>- Constitutional & legislative framework<br>- Sexual & gender-based violence<br>**SDGs:**<br>- 10 - REDUCED INEQUALITIES<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Women & girls | Not implemented<br>See Para 36, 37, 38 |
| 104.35 Ensure prompt and effective investigations into killings of lesbian, gay, bisexual and transgender persons and other related crimes and the prosecution of those responsible (Czechia); **Source of Position:** A/HRC/46/12/Add.1 - Para.21 | Supported | - Equality & non-discrimination<br>- Administration of justice & fair trial<br>- Sexual & gender-based violence<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | Not implemented<br>See Para 36 |
| 104.176 Protect and combat discrimination against lesbian, gay, bisexual, transgender and intersex persons (France); **Source of Position:** A/HRC/46/12/Add.1 - Para.10 | Supported | - Equality & non-discrimination<br>**SDGs:**<br>- 10 - REDUCED INEQUALITIES<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | Not implemented<br>See Para 36, 37, 38 |
| ***Theme: Human rights & climate change*** | | | |
| 104.37 Intensify efforts to develop and strengthen the necessary legislative frameworks to address cross-sectoral environmental challenges, including climate change adaptation and mitigation frameworks (Fiji); **Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Human rights & climate change<br>- Legal & institutional reform<br>- Constitutional & legislative framework<br>**SDGs:**<br>- 13 - CLIMATE ACTION<br>- 15 - LIFE ON LAND | Partially implemented<br>See para 30, 31, 32 |
| ***Theme: Conditions of detention*** | | | |
| 104.55 Take appropriate measures to improve the situation of its penitentiary system, including by addressing the issue of overcrowding and violence in prisons and juvenile detention centres (Republic of Korea); Intensify efforts to improve detention conditions for inmates and to reform the penitentiary system in general (Russian Federation); Take effective measures to bring conditions of detention in line with international standards, in particular by reducing overcrowding and inter-prisoner violence (Germany); **Source of Position:** A/HRC/46/12/Add.1 - Para.29 | Supported | - Conditions of detention<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Persons deprived of their liberty & detainees | Not implemented<br>See Para 17, 18. |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

10
Page 54 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

Public

| | | | |
|---|---|---|---|
| 104.56 Avoid the indiscriminate use of preventive detention, eradicate the severe prison overcrowding and improve precarious prison conditions (Bolivarian Republic of Venezuela); **Source of Position:** A/HRC/46/12/Add.1 - Para.29, 35 | Supported | - Conditions of detention **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Persons deprived of their liberty & detainees | <mark>Not implemented</mark> See Para 17, 18. |

### Theme: Administration of justice & fair trial

| | | | |
|---|---|---|---|
| 104.63 Strengthen the independence of the justice system by reviewing the procedure for selecting and appointing Supreme Court judges, the Attorney General and his or her deputy (Sweden); **Source of Position:** A/HRC/46/12/Add.1 - Para.13 | Supported | - Administration of justice & fair trial - Legal & institutional reform **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Judges, lawyers and prosecutors | <mark>Not implemented</mark> See Para 19. |
| 104.65 Enact a law to guarantee and strengthen judicial independence and update the procedures for selecting and appointing Supreme Court justices and the Attorney General and his or her deputy (United States of America); **Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Administration of justice & fair trial - Legal & institutional reform **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Judges, lawyers and prosecutors | <mark>Not implemented</mark> See Para 19. |
| 104.78 Increase efforts to ensure the independence of the judicial system, strengthening the investigation of and prosecution for acts of corruption and human rights violations, and prevent the criminalization of human rights defenders and community and Indigenous activists to ensure they are able to operate in a safe environment (Canada); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Administration of justice & fair trial - Human rights defenders - Good governance & corruption - Access to justice & remedy **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS **Affected persons:** - Human rights defenders & activists - Indigenous peoples - Judges, lawyers and prosecutors | <mark>Partially implemented</mark> See para.19, 21, 22, 25, 26. |

### Theme: Access to justice & remedy

| | | | |
|---|---|---|---|
| 104.212 Take all necessary steps to ensure that the recent reforms to the Criminal Code of Honduras meet international human rights obligations (United Kingdom of Great Britain and Northern Ireland); **Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Access to justice & remedy - Constitutional & legislative framework **SDGs:** - 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS | <mark>Partially implemented</mark> See para. 7, 26. |

### Theme: Freedom of opinion and expression & access to information

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

11

Public

AMNESTY INTERNATIONAL

| 104.85 Respect and protect the rights to freedom of opinion and expression and to freedom of peaceful assembly and association (Australia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.24 | Supported | - Freedom of opinion and expression & access to information<br>- Human rights defenders<br>- Freedom of association<br>- Liberty & security of the person<br>- Right to peaceful assembly<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | <mark>Partially implemented</mark><br>See para. 14, 28. |

## Theme: Right to health

| 104.138 Prioritize investment in the national health system in order to guarantee the availability of free, universal public health care for all (Malaysia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.14 | Supported | - Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING | <mark>Partially implemented</mark><br>See para. 40-41. |
| 104.139 Step up its efforts to respond to the health needs of and ensure access to the most vulnerable groups, including by allocating adequate funds (India);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.14 | Supported | - Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING<br>**Affected persons:**<br>- Vulnerable persons/groups | <mark>Partially implemented</mark><br>See para. 40-41 |
| 104.140 Continue its efforts to strengthen its national health-care system and the accessibility of essential health services, particularly during the COVID-19 pandemic (Singapore);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.14 | Supported | - Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING | <mark>Partially implemented</mark><br>See para. 40-41 |

## Theme: Sexual & reproductive health and rights

| 104.143 Improve equal access to health services, including sexual and reproductive health services (Germany);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.13 | Supported | - Sexual & reproductive health and rights<br>- Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING<br>- 5 - GENDER EQUALITY<br>**Affected persons:**<br>- Women & girls | <mark>Partially implemented</mark><br>See para. 33-34 |

## Theme: Violence against women

| 104.162 Take prompt action to end violence against women, including domestic, sexual and gender-based violence and femicides, and ensure full accountability for such acts (Estonia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Sexual & gender-based violence<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | <mark>Partially implemented</mark><br>See para. 35-36 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

12

Public

AMNESTY INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.174 Redouble its efforts in preventing and addressing violence against women, punishing those responsible and providing assistance and protection to victims (Philippines); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Access to justice & remedy<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |
| 104.183 Prevent and combat all acts of violence against women, bring perpetrators to justice and provide assistance and protection to victims (Ukraine); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Access to justice & remedy<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |
| 104.187 Adopt the measures necessary to reduce the number of acts of violence committed against women, including domestic violence, sexual violence and femicides, and to ensure access to justice for victims of this kind of violence (Argentina); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Sexual & gender-based violence<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |
| 104.188 Step up its efforts to prevent and combat all acts of violence against women, ensure accountability for those responsible and provide assistance and protection to victims of gender-based violence (Greece); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Access to justice & remedy<br>- Sexual & gender-based violence<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |
| 104.190 Redouble its efforts to prevent and combat all acts of violence against women, to punish those responsible and to provide assistance and protection to victims, including through the adoption of a comprehensive law on violence against women (Belgium); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Legal & institutional reform<br>- Access to justice & remedy<br>- Constitutional & legislative framework<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |
| 104.198 Strengthen the mechanisms to prevent and combat violence against women in order to protect victims and provide them with justice and rehabilitation and other forms of assistance (Djibouti); **Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Violence against women<br>- Legal & institutional reform<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para. 35-36 |

### Theme: Budget & resources (for human rights implementation)

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.16 Allocate adequate resources, both financial and human, for the Ministry of Human Rights to carry out its mandate (Slovakia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Budget & resources (for human rights implementation)<br>- Legal & institutional reform<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS | <mark>Partially implemented</mark><br>See para. 9. |
| **Theme: Rule of law & impunity** | | | |
| 104.50 Harmonize national legislation and laws with international standards to combat impunity in cases of torture, ill-treatment and inhuman and degrading treatment, and improve detention conditions (Egypt);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Rule of law & impunity<br>- Legal & institutional reform<br>- Access to justice & remedy<br>- Prohibition of torture & ill-treatment (including cruel, inhuman or degrading treatment)<br>- Conditions of detention<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Persons deprived of their liberty & detainees | <mark>Partially implemented</mark><br>See para. 7, 17. |
| 104.51 Investigate, prosecute and punish those responsible of serious crimes committed in the mass demonstrations after the 2017 elections and the health and education reforms, including killings, arbitrary detentions and cases of torture (Bolivarian Republic of Venezuela);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.21, 35 | Supported | - Rule of law & impunity<br>- Arbitrary arrest & detention<br>- Right to peaceful assembly<br>- Right to participate in public affairs & right to vote<br>- Prohibition of torture & ill-treatment (including cruel, inhuman or degrading treatment)<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Persons deprived of their liberty & detainees | <mark>Partially implemented</mark><br>See para. 14-15 |
| 104.72 Take effective steps against corruption, corrupt political networks and impunity by adopting concrete measures to restore citizens' trust in democratic institutions in Honduras (Poland);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.21 | Supported | - Rule of law & impunity<br>- Good governance & corruption<br>- Administration of justice & fair trial<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Public officials<br>- Judges, lawyers and prosecutors | <mark>Partially implemented</mark><br>See para. 21 |
| 104.73 Strengthen the fight against impunity and corruption by ensuring the absence of political interference in anti-corruption mechanisms and the independence of the judiciary, in accordance with targets 16.5 and 16.6 of the Sustainable Development Goals (Switzerland);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Rule of law & impunity<br>- Good governance & corruption<br>- Administration of justice & fair trial<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Judges, lawyers and prosecutors | <mark>Partially implemented</mark><br>See para. 21 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

14

Public

Uploaded on 08/15/2025 at 03:56:55 PM (Central Daylight Time), by Amnesty INA

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.79 Investigate and bring to justice cases of human rights violations implicating military forces and create a well-defined plan to complete the reform of the police and remove the military from civilian security duties (Canada); <br>**Source of Position:** A/HRC/46/12/Add.1 - Para.21 | Supported | - Rule of law & impunity <br>- Administration of justice & fair trial <br>- Legal & institutional reform <br>- Access to justice & remedy <br>**SDGs:** <br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS <br>**Affected persons:** <br>- Law enforcement / police & prison officials <br>- Judges, lawyers and prosecutors <br>- Military personnel | Partially implemented <br>See para. 10-18. |
| 104.81 Ensure the investigation and prosecution of the perpetrators of the alleged human rights violations that occurred during the coup d'état in 2009 and the intellectual and financial authors of the killing of the human rights defender Berta Cáceres (Costa Rica); Address impunity for attacks against human rights defenders and journalists without delay (Japan); Adopt concrete measures to guarantee respect for and protection of the work of human rights defenders and journalists, as well as to ensure that the crimes committed against them are investigated and those responsible are punished effectively and impartially (Ecuador); <br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Rule of law & impunity <br>- Human rights defenders <br>- Administration of justice & fair trial <br>- Access to justice & remedy <br>- Freedom of opinion and expression & access to information <br>**SDGs:** <br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS <br>**Affected persons:** <br>- Human rights defenders & activists <br>- Media | Partially implemented <br>See para. 14, 15, and 22-28. |
| **Theme: Liberty & security of the person** | | | |
| 104.43 Ensure that law enforcement is carried out exclusively by civilian police forces (Norway); <br>**Source of Position:** A/HRC/46/12/Add.1 - Para.16 | Supported | - Liberty & security of the person <br>**SDGs:** <br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS <br>**Affected persons:** <br>- Law enforcement / police & prison officials | Not implemented <br>See para. 10-14. |
| 104.44 Conduct prompt investigations into all allegations of human rights violations and abuses committed by the security forces, including acts of torture and extrajudicial executions, in order to ensure redress for victims and hold perpetrators fully accountable (Italy); <br>**Source of Position:** A/HRC/46/12/Add.1 - Para.30 | Supported | - Liberty & security of the person <br>- Access to justice & remedy <br>- Prohibition of torture & ill-treatment (including cruel, inhuman or degrading treatment) <br>- Extrajudicial, summary or arbitrary executions <br>**SDGs:** <br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS <br>**Affected persons:** <br>- Law enforcement / police & prison officials <br>- Persons deprived of their liberty & detainees | Partially implemented <br>See para. 13, 14. |

Honduras. Insufficient human rights progress <br>Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025 <br>APRIL 2025 <br>LANGUAGE: ENGLISH <br>**amnesty.org**

15

Public



| | | | |
|---|---|---|---|
| 104.48 Adopt and implement the proposed use-of-force legislation to guide security forces ' interactions with civilians and develop operational law capacity and training to facilitate advice to commanders on human rights issues (United States of America);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.7 | Supported | - Liberty & security of the person<br>- Legal & institutional reform<br>- Human rights education, trainings & awareness raising<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Law enforcement / police & prison officials | **Not implemented**<br>See para 16. |

## Theme: Sexual & gender-based violence

| | | | |
|---|---|---|---|
| 104.193 Strengthen measures for the prevention, investigation and punishment of all sexual and gender-based violence, including most specifically domestic violence and violence against lesbian, gay, bisexual, transgender and intersex persons (Canada);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Sexual & gender-based violence<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Women & girls | **Partially implemented**<br>See para 34-39 |

## Theme: Right to peaceful assembly

| | | | |
|---|---|---|---|
| 104.88 Ensure respect for the exercise of peaceful protests in accordance with international standards and protect freedom of expression and assembly (Japan);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.24 | Supported | - Right to peaceful assembly<br>- Human rights defenders<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | **Partially implemented**<br>See para 14-15, 25,-26, and 28. |

## Theme: Indigenous peoples

| | | | |
|---|---|---|---|
| 104.205 Prioritize the promotion and protection of the rights of indigenous people during the implementation of various economic projects in their territory (Islamic Republic of Iran);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.18 | Supported | - Indigenous peoples<br>- Economic, social & cultural rights - general measures of implementation<br>- Land & property rights<br>- Right to an adequate standard of living<br>**SDGs:**<br>- 1 - NO POVERTY<br>- 2 - ZERO HUNGER<br>- 10 - REDUCED INEQUALITIES<br>- 11 - SUSTAINABLE CITIES AND COMMUNITIES<br>**Affected persons:**<br>- Indigenous peoples | **Partially implemented**<br>See para. 23, 26 and 29. |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

16

Public

AMNESTY
INTERNATIONAL

| 104.209 Respect the rights of indigenous peoples and peasants, in particular their right to prior consultation, in accordance with the declarations on the rights of indigenous peoples and the rights of peasants (Switzerland); **Source of Position:** A/HRC/46/12/Add.1 - Para.18 | Supported | - Indigenous peoples<br>- Right to participate in public affairs & right to vote<br>- Land & property rights<br>**SDGs:**<br>- 10 - REDUCED INEQUALITIES<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Indigenous peoples | <mark>Partially implemented</mark><br>See para. 23, 26 and 29. |

### Theme: Human rights defenders

| 104.71 Bring to justice and effectively punish the perpetrators of assaults against and killings of human rights defenders, such as the recent killing of the environmental defender of Guapinol (France); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Right to life<br>- Liberty & security of the person<br>- Access to justice & remedy<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | <mark>Partially implemented</mark><br>See para 23, 24 |
| 104.82 Provide the national protection system and the Office of the Special Prosecutor the necessary funding and operational capacity by the next universal periodic review (Czechia); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Administration of justice & fair trial<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Public officials<br>- Media | <mark>Partially implemented</mark><br>See Para 23, 27. |
| 104.86 Stop misusing criminal law for prosecuting, paralysing and delegitimizing the work of human right defenders (Estonia); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Liberty & security of the person<br>- Constitutional & legislative framework<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | <mark>not implemented</mark><br>see para 25, 26. |
| 104.87 Effectively implement the law on the protection of human rights defenders and enhance efforts to create a safe and enabling environment for them (Italy); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Constitutional & legislative framework<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | <mark>Partially implemented</mark><br>See para 22-27 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

17

Public

Uploaded on 08/15/2025 at 03:35:35 PM (Central Daylight Time) by Ryan G - JNA

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.90 Ensure the effectiveness of the Mechanism for the Protection of Human Rights Defenders, Journalists, Social Communicators and Justice Officials by allocating sufficient funds and by comprehensively evaluating its performance (Netherlands); Ensure technical and financial resources to the recently created mechanisms to protect human rights defenders (Portugal); Implement more effectively and fully the 2016 national protection mechanism to ensure the protection of human rights defenders (Ireland);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Access to justice & remedy<br>- Freedom of opinion and expression & access to information<br>- Budget & resources (for human rights implementation)<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | <mark>Partially implemented</mark><br>See para 22-28 |
| 104.91 Refrain from criminalizing human rights defenders and ensure their protection (Norway);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Liberty & security of the person<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | <mark>Partially implemented</mark><br>See para 22-27 |
| 104.92 Ensure that crimes against human rights defenders, journalists, lesbian, gay, bisexual, transgender and intersex persons, indigenous people and Afro-Honduran activists are properly investigated and that those responsible are held accountable (Norway);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Liberty & security of the person<br>- Access to justice & remedy<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Indigenous peoples<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Media<br>- Minorities/ racial, ethnic, linguistic, religious or descent-based groups | <mark>Partially implemented</mark><br>See para 22-28, 37 |
| 104.93 Protect journalists and human rights defenders, including by allocating sufficient resources to the protection mechanism for human rights defenders and by involving civil society (France);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Liberty & security of the person<br>- Access to justice & remedy<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | <mark>Partially implemented</mark><br>See para 22-28 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

18
Page 62 of 69

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.96 Take all necessary measures to preserve a free, safe and enabling environment for human rights defenders, journalists and media workers and ensure that they can do their work without facing intimidation or harassment (Slovakia); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Right to physical & moral integrity<br>- Legal & institutional reform<br>- Liberty & security of the person<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | Partially implemented<br>See para 22-28 |
| 104.97 Ensure thorough, prompt, impartial and independent investigations into all attacks, threats and assaults against human rights defenders and journalists, and bring to justice those suspected of criminal responsibility for such crimes (Slovenia); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Administration of justice & fair trial<br>- Liberty & security of the person<br>- Access to justice & remedy<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | Partially implemented<br>See para 23, 24. |
| 104.98 Strengthen, including through financial means, the national system and the Mechanism for the Protection of Human Rights Defenders, Journalists, Social Communicators and Justice Officials and the Office of the Special Prosecutor for the Protection of Human Rights Defenders, Journalists, Social Communicators and Justice Officials in order to provide an effective response to the violence and harassment suffered by these people (Spain); **Source of Position:** A/HRC/46/12/Add.1 - Para.9 | Supported | - Human rights defenders<br>- Administration of justice & fair trial<br>- Legal & institutional reform<br>- Liberty & security of the person<br>- Access to justice & remedy<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | Partially implemented<br>See para 27. |
| 104.100 Substantially improve efforts to effectively protect journalists, human rights defenders and environmentalists, as well as vulnerable groups such as women, youth, lesbian, gay, bisexual, transgender and intersex persons and indigenous people, including by effectively combating impunity (Germany); **Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Indigenous peoples<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Women & girls<br>- Media | Partially implemented<br>See para 22-28, 37 |

EOIR – 64 of 70

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

19
Page 63 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.102 Increase protections for lesbian, gay, bisexual, transgender and intersex individuals, journalists and human rights defenders, including environmental human rights defenders, from threats and attacks and fully investigate, prosecute and punish all acts of violence in accordance with the law (Australia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Liberty & security of the person<br>- Access to justice & remedy<br>- Sexual & gender-based violence<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Media | <mark>Partially implemented</mark><br>See para 22-28, 37. |
| 104.103 Strengthen efforts to promptly, effectively and impartially investigate any allegations of violence or reprisals against journalists, human rights defenders, land rights defenders and lesbian, gay, bisexual, transgender and intersex persons and ensure that perpetrators are held accountable (Austria);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Liberty & security of the person<br>- Access to justice & remedy<br>- Sexual & gender-based violence<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI)<br>- Media | <mark>Partially implemented</mark><br>See para 23, 24, 37. |
| 104.104 Take further steps to improve the effectiveness of the Mechanism for the Protection of Human Rights Defenders, Journalists, Social Communicators and Justice Officials (Greece);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Legal & institutional reform<br>- Liberty & security of the person<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | <mark>Partially implemented</mark><br>See para 27. |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

20

Page 64 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.106 Ensure thorough, prompt, impartial and independent investigations into all attacks, threats and assaults against human rights defenders and bring to justice those suspected of such crimes (Belgium);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Administration of justice & fair trial<br>- Access to justice & remedy<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | Partially implemented<br>See para 23, 24. |
| 104.107 Ensure investigation into and accountability for attacks, acts of reprisal and violence against journalists and human rights defenders (Brazil);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.6 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Access to justice & remedy<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Media | Partially implemented<br>See para 23, 24, 28. |
| 104.108 Protect freedom of expression by promptly investigating acts of intimidation and harassment and attacks against journalists, human rights defenders and indigenous, Afrodescendant and community activists and by prosecuting those responsible (Canada);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.5 | Supported | - Human rights defenders<br>- Rule of law & impunity<br>- Access to justice & remedy<br>- Freedom of opinion and expression & access to information<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists<br>- Indigenous peoples<br>- Media<br>- Minorities/ racial, ethnic, linguistic, religious or descent-based groups | Partially implemented<br>See para 22- 28. |
| **Theme: Ratification of & accession to international instruments** | | | |
| 104.1 Ratify the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women (Marshall Islands);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Discrimination against women<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | Not implemented<br>See para 8. |

EOIR — 66 of 70

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

21
Page 65 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| 104.2 Ratify the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women (France);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Discrimination against women<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | <span style="background-color:red">Not implemented</span><br>See para. 8. |
|---|---|---|---|
| 104.3 Ratify the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women (Denmark) (Chile) (Bolivarian Republic of Venezuela) (Portugal) (Argentina) (Slovakia); Ratify the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women in line with targets 1.4, 4.3 4.6 of the Sustainable Development Goals and Goal 5 (Paraguay); Accede to the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women (Ireland);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12, 35 | Noted | - Ratification of & accession to international instruments<br>- Discrimination against women<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | <span style="background-color:red">Not implemented</span><br>See para. 8. |
| 104.4 Consider ratifying the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women (Greece);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Discrimination against women<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | <span style="background-color:red">Not implemented</span><br>See para. 8. |
| 104.5 Ratify the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women to ensure the protection of women ' s and girls ' rights (Austria);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Discrimination against women<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Women & girls | <span style="background-color:red">Not implemented</span><br>See para. 8. |
| 104.7 Ratify the Optional Protocol to the Convention on the Rights of the Child on a communications procedure (Chile) (Portugal) (Slovakia);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Children: definition; general principles; protection<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Children | <span style="background-color:red">Not implemented</span><br>See para. 8. |
| 104.8 Ratify the Domestic Workers Convention, 2011 (No. 189), of the International Labour Organization (Marshall Islands);<br>**Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Labour rights and right to work<br>**SDGs:**<br>- 8 - DECENT WORK AND ECONOMIC GROWTH<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Migrants<br>- Vulnerable persons/groups | <span style="background-color:red">Not implemented</span><br>See para. 8. |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

22

Page 66 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public

AMNESTY
INTERNATIONAL

| | | | |
|---|---|---|---|
| 104.9 Ratify the Domestic Workers Convention, 2011 (No. 189), of the International Labour Organization (Bolivarian Republic of Venezuela); Ratify the Domestic Workers Convention, 2011 (No. 189), of the International Labour Organization, to advance Sustainable Development Goals 5.4, 8 and 16 (Paraguay); **Source of Position:** A/HRC/46/12/Add.1 - Para.12, 35 | Noted | - Ratification of & accession to international instruments<br>- Labour rights and right to work<br>**SDGs:**<br>- 8 - DECENT WORK AND ECONOMIC GROWTH<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Migrants<br>- Vulnerable persons/groups | <mark>Not implemented</mark><br>See para 8. |
| 104.10 Ratify the Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean (Escazú Agreement) (Panama) (Costa Rica); Sign and ratify the Regional Agreement on Access to Information, Public Participation and Justice in Environmental Matters in Latin America and the Caribbean (Escazú Agreement) (Ireland); **Source of Position:** A/HRC/46/12/Add.1 - Para.12 | Noted | - Ratification of & accession to international instruments<br>- Human rights & the environment<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Human rights defenders & activists | <mark>Not implemented</mark><br>See para 8. |

### Theme: Equality & non-discrimination

| | | | |
|---|---|---|---|
| 104.33 Make progress towards the adoption of a law that effectively implements article 60 of the Constitution and adapt Honduran legislation to the doctrine and jurisprudence of the Inter-American Court of Human Rights in order to allow people of the same sex to marry without discrimination (Spain); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Equality & non-discrimination<br>- Rights related to marriage & family<br>- Administration of justice & fair trial<br>- Legal & institutional reform<br>- Constitutional & legislative framework<br>**SDGs:**<br>- 10 - REDUCED INEQUALITIES<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Lesbian, gay, bisexual and transgender and intersex persons (LGBTI) | <mark>Not implemented</mark><br>See para 38. |

### Theme: Sexual & reproductive health and rights

| | | | |
|---|---|---|---|
| 104.144 Lift the ban on the use of emergency contraceptive pills, currently prohibited even in cases of rape (Iceland); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Sexual & reproductive health and rights<br>- Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING<br>- 5 - GENDER EQUALITY<br>**Affected persons:**<br>- Women & girls | <mark>Implemented</mark><br>See para.33 |
| 104.146 Guarantee the rights to sexual and reproductive health, including access to emergency contraception methods and by decriminalizing abortion (France); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Sexual & reproductive health and rights<br>- Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING<br>- 5 - GENDER EQUALITY<br>**Affected persons:**<br>- Women & girls | <mark>Partially implemented</mark><br>See para 33 |

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

23

Public



| 104.147 Decriminalize abortion in all circumstances and remove legal, administrative and practical barriers to accessing safe and legal abortion services (Iceland); Decriminalize abortion and ensure safe, legal abortions, particularly in cases where the woman's life or health is in danger, where the fetus suffers from fatal or severe impairment, or where pregnancy is the result of rape or incest (Slovenia); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Sexual & reproductive health and rights<br>- Legal & institutional reform<br>- Right to health<br>**SDGs:**<br>- 3 - GOOD HEALTH AND WELL-BEING<br>- 5 - GENDER EQUALITY<br>**Affected persons:**<br>- Women & girls | Not implemented<br>See para 33. |

### Theme: Violence against women

| 104.180 Take action to eliminate all forms of violence against women and girls, in particular by establishing accessible and effective protection mechanisms, including the right to emergency contraception pills, especially in cases of rape or sexual abuse, in accordance with target 5.2 of the Sustainable Development Goals (Switzerland); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Violence against women<br>- Sexual & gender-based violence<br>- Sexual & reproductive health and rights<br>**SDGs:**<br>- 5 - GENDER EQUALITY<br>**Affected persons:**<br>- Women & girls | Partially implemented<br>See para 33. |

### Theme: Rule of law & impunity

| 104.67 Strengthen the mandate of the Mission to Support the Fight against Corruption and Impunity and implement the recommendations made by the Truth and Reconciliation Commission (Maldives); Renew the mandate of the Mission to Support the Fight against Corruption and Impunity (Timor-Leste); **Source of Position:** A/HRC/46/12/Add.1 - Para.8 | Noted | - Rule of law & impunity<br>- Good governance & corruption<br>- Legal & institutional reform<br>**SDGs:**<br>- 16 - PEACE, JUSTICE AND STRONG INSTITUTIONS<br>**Affected persons:**<br>- Judges, lawyers and prosecutors | Not implemented<br>See para 21. |

[i] Human Rights Council, Report of the Working Group on the Universal Periodic Review, Honduras, Addendum, 15 March 2021, A/HRC/46/12/Add.1.

[ii] Ibid.

[iii] Human Rights Council, Report of the Working Group on the Universal Periodic Review, Honduras, 16 December 2020, A/HRC/46/12, recommendations 104.78 (Canada); 104.81 (Ecuador); 104.84 (Estonia); 104.87 (Italy); 104.91 (Norway); 104.93 (France); 104.96 (Slovakia); 104.99 (Switzerland); 104.100 (Germany); 104.102 (Australia).

[iv] Global Witness, Voces silenciadas La violencia contra las personas defensoras de la tierra y el medioambiente Publicada: 10 September 2024. https://globalwitness.org/es/campaigns/land-and-environmental-defenders/voces-silenciadas/

[v] Human Rights Council, Report of the Working Group on the Universal Periodic Review, Honduras, 16 December 2020, A/HRC/46/12, recommendation 104.79 (Canada).

[vi] UN CAT, Concluding observations on the third periodic report of Honduras CAT/C/HND/CO/3, 27 May 2024, https://www.ohchr.org/en/documents/concluding-observations/catchndco3-concluding-observations-third-periodic-report-honduras

[vii] Agencia Ocote, El estado de excepción hondureño: sin éxito, pero con víctimas, November 2024, https://www.agenciaocote.com/blog/2024/11/20/el-estado-de-excepcion-hondureno-sin-exito-pero-con-victimas/

[viii] CONADEH En el marco del estado de excepción: Alrededor de 700 quejas contra miembros de los cuerpos de seguridad atendió CONADEH – Comisionado Nacional de los Derechos Humanos, January 10, 2025, https://conadeh.hn/?p=3773

[ix] A/HRC/56/56/Add.1: Visit to Honduras - Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, 24 June 2024, A/HRC/56/56/Add.1, https://docs.un.org/A/HRC/56/56/Add.1

[x] Honduras: Militarisation of prisons and detention conditions raise concerns, UN torture prevention body says, 25 April 2024, https://www.ohchr.org/en/press-releases/2024/04/honduras-militarisation-prisons-and-detention-conditions-raise-concerns-un

[xi] UNWGAD, opinion 85/2020, (Honduras) A/HRC/WGAD/2020/85, 24 February 2021.

[xii] IACHR, IACHR Concerned About the Implementation of Legislative Reforms with a Regressive Impact on the Exercise of the Right to Protest in Honduras November 16, 2021 https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/304.asp

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH
**amnesty.org**

Public

xiii IA Court of Human Right, Case of the Punta Piedra community and its members vs Honduras (Preliminary Objections, Merits, Reparations, and Costs) 5 October 2015, https://www.corteidh.or.cr/docs/casos/articulos/seriec_304_ing.pdf

xiv International Monetary Fund, Honduras: High-level Summary Technical Assistance Report: Climate Policy Diagnosis, November 8, 2024, https://www.imf.org/en/Publications/high-level-summary-technical-assistance-reports/Issues/2024/11/08/Honduras-Diagnstico-de-Poltica-Climtica-557209 and World Bank Group, Honduras Country Climate and Development Report, 2023, https://openknowledge.worldbank.org/handle/10986/39820

xv UNAH, Observatorio Nacional de la Violencia Boletin Muerte Violenta de Mujeres y Femicidios, 2023. https://iudpas.unah.edu.hn/dmsdocument/17842-boletin-muerte-violenta-de-mujeres-y-femicidios-ene-dic-2023-ed-no-19

xvi World Health Organization, The Global Health Observatory, Hospital beds (per 10,000 population), Disponible en: https://www.who.int/data/gho/data/indicators/indicator-details/GHO/hospital-beds-(per-10-000-population)

xvii World Health Organization, The Global Health Observatory, Domestic general government health expenditure (GGHE-D) as percentage o gross domestic product (GDP), Disponible en: https://www.who.int/data/gho/data/indicators/indicator-details/GHO/domestic-general-government-health-expenditure-(gghe-d)-as-percentage-of-gross-domestic-product-(gdp)-(-)

xviii World Health Organization, The Global Health Observatory, Out of pocket expenditure as percentage of current health expenditure (CHE)(%), Disponible en: https://www.who.int/data/gho/data/indicators/indicator-details/GHO/out-of-pocket-expenditure-as-percentage-of-current-health-expenditure-(che)-(-)

EOIR — 70 of 70

Honduras. Insufficient human rights progress
Submission to the 50th session of the UPR Working Group, November 2025

25

Page 69 of 69

INDEX AMR 37/9180/2025
APRIL 2025
LANGUAGE: ENGLISH

**amnesty.org**

Public